# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

TRACY MCKNEELY

VERSUS

ZACHARY POLICE DEPARTMENT,
et al.

CIVIL ACTION

NO. 12-354-SDD-RLB

## RULING

This matter is before the Court on the *Motions for Summary Judgment*[1] filed by Defendants, Zachary Police Department and Darryl Lawrence. Plaintiff, Tracy McKneely, has filed an *Opposition*[2] to the motion. For the reasons which follow, the motions are GRANTED.[3]

## I.   FACTUAL BACKGROUND

Tracy McKneely ("Plaintiff") began working for the Zachary Police Department ("ZPD" or "Defendant") in May of 2007 as a Communications Officer. Plaintiff's job duties included answering telephone calls and dispatching police units, emergency medical services, and the fire department as needed, as well as handling general non-emergency calls. Additionally, this position required Plaintiff to be Peace Officer Standards and Training ("POST") certified and carry a firearm for which she had to re-qualify every year. All communications officers in the ZPD work twelve

---

[1] Rec. Docs. 18 & 17.

[2] Rec. Doc. 26.

[3] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

hour shifts divided into A, B, C, and D shifts which last from 4:30 to 4:30 or 10:30 to 10:30. The shifts alternate in such a way that all officers work the same number of day and night shifts throughout the month.[4]

Plaintiff often worked with Defendant, Darryl Lawrence ("Lawrence"), as he was her supervisor. Plaintiff and her husband became friends with Lawrence and his wife, Jocelyn, who was also employed by the ZPD. The couples routinely socialized together at events, football games, and barbeques.[5] Plaintiff claims that, when she began having marital problems in January of 2010, she often confided in Jocelyn and Darryl Lawrence about her impending divorce. Plaintiff claims she looked at Darryl Lawrence like a "big brother" and often visited the Lawrences' home.

In February of 2010, Plaintiff had a verbal confrontation with her husband on the telephone at work and threatened to kill him in Lawrence's presence.[6] Lawrence was concerned by this and attempted to calm Plaintiff before allowing her to go home. As a result of this incident, Plaintiff turned in her weapon and was allowed a few weeks of medical leave to address the marital issues affecting her work performance.[7] During this time, Plaintiff borrowed $1500 from Jocelyn Lawrence to pay a divorce attorney. Plaintiff re-paid this loan within a month.[8]

Plaintiff claims that beginning in November of 2010, after she and her husband separated, she was subjected to ongoing sexual harassment by Lawrence. Plaintiff specifically alleges that

---

[4] Deposition of Tracy McKneely, pp. 158-159.

[5] *Id.* at p. 49.

[6] *Id.* at pp. 66-68.

[7] *Id.* at p. 69; pp. 72-73.

[8] *Id.* at pp. 74-75.

Doc 178                                    2

Lawrence began making sexual comments to her and in her presence at work.  Lawrence allegedly told Plaintiff in front of two other male police officers that she had cobwebs on her p**** and needed them to be knocked off.[9]  Plaintiff also claims Lawrence began repeatedly asking her for sex, posing questions such as "when are you going to give me some of that p****?  I want to see how good it is."[10]  Plaintiff claims she responded that "[y]ou are not going to disrespect me like that," and that she made it clear to Lawrence that his comments were not welcome.[11]  Plaintiff alleges that following this incident, she reported the harassment to Lieutenant Louis Banks.

Plaintiff claims the sexual comments continued, specifically referring to an incident in March of 2011 when Lawrence allegedly told her that, if she and his wife weren't friends, he "would get that p****" and he would "see how good it is."[12]  Plaintiff contends she again told Lawrence to stop and leave her alone, but he propositioned her for sex shortly thereafter.  Plaintiff claims that in addition to these work-related incidents,  Lawrence also called her on several other occasions inviting himself to her house for sex.[13]  In early summer of 2011, Plaintiff's friend, Sharon Sterling, asked her about handling a photo ticket she had been issued.  When Plaintiff asked about the ticket, Lawrence allegedly advised Plaintiff to tell Sterling that he would fix the ticket if she would come to the office in a short skirt without panties and let him "play with her p****."[14]  Plaintiff contends,

---

[9] *Id.* at p. 79.

[10] *Id.* at pp. 89-90.

[11] *Id.*

[12] *Id.* at pp. 91-93.

[13] *Id.* at pp. 94-95.

[14] *Id.* at pp. 107-108.

Doc 178                                        3

when she refused Lawrence's request, he relayed this request to Sterling himself over the phone.[15]
Lawrence also allegedly forced Plaintiff to view a nude picture of a woman's private parts on his cell
phone.[16]

The last incident of harassment occurred in June of 2011 when Lawrence allegedly asked
Plaintiff for her p**** when she was walking to her car to leave work.[17]  Plaintiff testified that, after
this incident, she believed Lawrence realized that she was not interested in him and that there were
no further sexual comments towards her after this date.[18]

Plaintiff contends other female co-workers were offended by Lawrence's conduct.  Plaintiff
alleges Nikita Parker was sexually harassed by Lawrence in 2005 and was mistreated by the ZPD
until she quit.[19]  Plaintiff also contends ZPD Communications Officer Melody Hills ("Hills")
confided in Plaintiff about Lawrence kissing her without invitation at work.[20]  Plaintiff claims Hills
was subjected to continued harassment by Lawrence at work consisting of comments about her hair
and clothing and sexually suggestive text messages.[21]  Plaintiff claims that, prior to filing her August
2011 written complaint against Lawrence, he confronted Plaintiff in front of several co-workers

---

[15] *Id.* at pp. 107-108

[16] *Id.* at pp. 114-115.

[17] *Id.* at pp. 94-95.

[18] *Id.* at pp. 101-102.

[19] *Id.* at p. 240.

[20] *Id.* at pp. 96-98; 189-90.

[21] Deposition of Melody Hill, pp. 37-38; 42-43; 65-67.

while on duty at Southern University and accused her and Hills of "being out to get him."[22] Plaintiff contends Lawrence then threatened that he had a lot of money and would clear his name.[23]

Lawrence's wife Jocelyn allegedly confronted Plaintiff in September of 2011 asking why Plaintiff did not come over anymore.  Plaintiff contends she told Jocelyn to leave the issue alone because she did not know the whole story.  Jocelyn allegedly commented to Plaintiff that Hills was interested in Lawrence and Jocelyn would "whoop Ms. Hills' ass."[24] Plaintiff also claims she heard Jocelyn threatening to tackle Plaintiff in front of Lawrence, Communications Supervisor Shawntell Johnson, and Communications Officer Maureen Allen, who were all Plaintiff's supervisors.  At this point in time, Plaintiff went to Human Resources with a formal complaint, which she filed in October of 2011.[25]

The ZPD contends that Zachary's Human Resources Department immediately began investigating the complaints.  The Acting Chief David Courtney placed Lawrence on administrative leave and contacted the Louisiana Attorney General's Office to conduct an independent outside investigation of the complaints by both Plaintiff and Hills.[26] Plaintiff, Hills, and several other employees of ZPD were interviewed by the Attorney General's investigator.  Upon concluding the investigation, the investigator delivered a report to Chief David McDavid.  ZPD contends Plaintiff

---

[22] Rec. Doc. 26-5, p. 5.

[23] Deposition of Tracy McKneely, pp. 117-118.

[24] Rec. Doc. 26-5, p. 5, citing Deposition of Tracy McKneely, pp. 83-86.

[25] Deposition of Tracy McKneely, pp. 85-86; 212.

[26] *Id.* at pp. 86-87.

has suffered no further sexual harassment following this investigation.

Plaintiff alleges that, since filing her formal complaint, she has been subjected to retaliatory harassment in various ways. Plaintiff contends she has had her shift changed without explanation to accommodate new hires despite her seniority with the ZPD. Plaintiff further claims that a new communications hire was told by ZPD Chief McDavid that "no one wants to work with Ms. McKneely."[27] Plaintiff claims her shifts have been changed five times in the last two years and that, before her sexual harassment complaint, her shift had only been changed once.[28] Plaintiff also claims these shifts changes have caused her to lose time with her family and constitute retaliation for making and reporting her claim against Lawrence.

When she calls in sick, Plaintiff claims she is referred to a doctor chosen by ZPD or subject to termination. She has further alleged that, when she provides an excuse from her own doctor, she is questioned.[29] Plaintiff claims that on one occasion, when she was seeing a specialist, Chief McDavid called to advise her that ZPD had made a doctor's appointment for her at the same time. When she failed to answer this call because she was in her own doctor's office, Plaintiff claims Captain Randy Aulds and Supervisor Shawntell Johnson went to her house, knocked on her door, and walked around her house for 30-40 minutes.[30]

Although Lawrence was placed on administrative leave following Plaintiff's October 2011

---

[27] Rec. Doc. 26-5, p. 6.

[28] Deposition of Tracy McKneely, p. 227.

[29] *Id.* at p. 153; pp. 200-201.

[30] *Id.* at p. 201.

complaint, Plaintiff contends he has never been disciplined for sexual harassment despite reports by several other female co-workers.[31]

On December 20, 2011, Lawrence went to the shooting range to re-qualify his weapons. Plaintiff claims she was sent to the shooting range on this same day to re-qualify with her weapon because she had been experiencing problems with her right arm and hand.  While attempting to shoot, Plaintiff contends she felt intense pain in her right arm and hand.  Plaintiff further contends she was "shocked" to see Lawrence at the range that day because she did not expect him to return to work.[32]  While at the range, Lawrence advised Plaintiff he was returning to work the next day.  Plaintiff claims that Chief McDavid had not advised her of Lawrence's return.[33]  Lieutenant Ray Day called Chief McDavid from the range and informed him that Plaintiff was upset to learn that Lawrence was returning to work; however, Chief McDavid advised that Lawrence did not have to leave because he had to re-qualify his weapons for his return.  Plaintiff contends she was unable to re-qualify on that date because she was upset by the circumstances.[34]

The record reflects that from December 2010 to May 2012, Plaintiff's ability to shoot was restricted by her doctor and she was placed on medical leave.[35]  Plaintiff claims that on January 12, 2011, while on medical leave, she was ordered to report to a mandatory meeting in Chief McDavid's

---

[31] Deposition of Chief McDavid, p. 83.

[32] Deposition of Tracy McKneely, p. 177.

[33] *Id.* at pp. 151-152.

[34] *Id.* at pp.146-177.

[35] *Id.* at p. 138.

office.  At this meeting, McDavid gave Plaintiff medical forms to be completed by her doctor.

Plaintiff also claims during their discussion Chief McDavid told her to "shut up."  Plaintiff claims

she told McDavid not to tell her to shut up and then she began to walk out.  McDavid allegedly

threatened to fire Plaintiff if she walked out, so she remained.  Thereafter, McDavid advised Plaintiff

she was being placed on administrative leave while ZPD investigated an anonymous report that

Plaintiff had falsified an affidavit for her nephew so he could attend school.  Plaintiff contends she

has custody of her nephew, and they live within the proper geographical limits for the school.  Also,

Plaintiff argues that, as the ZPD officer at the school in question, Jocelyn Lawrence had access to

the school records of Plaintiff's nephew.  Plaintiff believes Jocelyn Lawrence to be the "anonymous"

source of the investigation, and she further contends this is evidence of harassment and retaliation.

Although Plaintiff was cleared of any misconduct, she claims she was placed on disciplinary leave

and threatened with termination while the investigation was pending.

Plaintiff further alleges that, at this meeting with Chief McDavid, he forbade her from

speaking with the media again, since she had already spoken to the media about her alleged sexual

harassment claim.  According to Plaintiff, McDavid said, "If you go back to the news media, I'm

going to fire you."[36]  Plaintiff was also later disciplined with a 30 day suspension without pay for

insubordination and conduct in the meeting with Chief McDavid, which Plaintiff believes was an

extreme consequence under the circumstances.[37]

Plaintiff was ultimately allowed to return to work in May of 2012 without re-qualifying her

---

[36] *Id.* at p. 131.

[37] *Id.* at pp. 136-137.

weapon, and she was placed on light duty. Plaintiff contends she should have been placed on light duty in December of 2011, but McDavid allegedly told her she could not return to work until she could shoot her weapon.[38] Plaintiff claims she was forced to exhaust her own accumulated leave time during this period when she could have been working light duty.

Returning to work has allegedly caused Plaintiff great distress as Lawrence remains a supervisor and she must work with him every day. Plaintiff claims she had trouble focusing and began taking anti-anxiety medications in early 2012. Plaintiff also claims that her sister has been followed, stopped, harassed, and even physically injured as the result of an aggressive traffic stop by the ZPD as further retaliation against Plaintiff. As a result of her sister's traffic stop, Plaintiff contends she is now under an Internal Affairs investigation.[39]

Plaintiff filed this lawsuit against both Darryl Lawrence and the ZPD on June 13, 2012, alleging claims of sexual harassment and retaliation under federal and state law, violations of her rights under the First and Fourteenth Amendments to the Constitution, and illegal reprisal under the Louisiana Whistleblower law.[40] On August 6, 2013, Plaintiff filed an *Amended Complaint* to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* for sexual harassment and retaliation.[41]

---

[38] *Id.* at pp. 139-140.

[39] Rec. Doc. 26-4, Affidavit of Tracy McKneely, pp. 19-20.

[40] La. R.S. 23:967.

[41] Rec. Doc. 29.

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[42]  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[43] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[44]  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[45]

If the moving party meets this burden, Rule 56 (c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.[46]  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions,

---

[42] Fed. R. Civ. P. 56(c);  *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996);  *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

[43] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  *See also Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir. 1995).

[44] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (*quoting Celotex*, 477 U.S. at 323-25, 106 S.Ct. at 2552).

[45] *Id.* at 1075.

[46] *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

metaphysical doubt as to the facts, or a scintilla of evidence.[47]  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[48]  The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[49]  Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[50]

### B.    Claims against Lawrence in Official and Individual Capacities

Contrary to Plaintiff's contention that she can maintain an action against both the ZPD and Lawrence in his official capacity, "[i]t is well settled that a section 1981 or 1983 suit against a state official in his or her official capacity is a suit against the state [or municipality] itself."[51]  Additionally, " 'a party may not maintain a suit against both an employer and its agent under Title VII.'"[52]  In fact, "[i]ndividuals are not liable under Title VII in either their individual or official capacity."[53]  Accordingly, all Section 1983 claims against Lawrence in his official capacity are dismissed with prejudice, and all Title VII claims against Lawrence are dismissed with prejudice.

---

[47] *Little*, 37 F.3d at 1075;  *Wallace*, 80 F.3d at 1047.

[48] *Wallace*, 80 F.3d at 1048 (*quoting Little*, 37 F.3d at 1075).  *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

[49] *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).

[50]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[51] *King v. Louisiana*, No. 07-31069, 294 F. App'x 77,83, 2008 WL 4326493, *4 (5th Cir. Sept. 23, 2008)(citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

[52] *Id.*, quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999).

[53] *Ackel v. Nat'l Commc'ns Inc.*, 339 F.3d 376, 381 n. 1 (5th Cir. 2003).

### C.   Hostile Work Environment under Title VII, the LEDL, and 42 U.S.C. § 1983

Because the Louisiana Employment Discrimination Law ("LEDL") requires the same elements of proof as a Title VII hostile work environment claim, these claims are jointly addressed and analyzed.[54] Title VII and Section 1983 actions are also "parallel causes of action"[55] for which "the inquiry into intentional discrimination is essentially the same."[56]

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[57] Sexual harassment is a form of sex discrimination. The Supreme Court has recognized two types of sexual harassment claims: those based on requests for sexual favors that result in adverse employment actions (a *quid pro quo* claim) and those where bothersome attentions or sexual remarks create a hostile work environment.[58]

In order to establish a *prima facie* case of hostile work environment, a plaintiff must show the following: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment of which plaintiff complained was based on sex/gender; (4) the harassment

---

[54] *See Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)("[T]he analysis under both statutes are identical"); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

[55] *Cervantez v. Bexar County Civil Serv. Comm'n*, 99 F.3d 730, 734 (5th Cir. 1996).

[56] *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 166 (5th Cir. 2007). Thus, the Court's analysis and ruling as to the ZPD also applies to Plaintiff's Section 1983 claims against Lawrence in his individual capacity.

[57] 42 U.S.C. § 2000e-2(a)(1).

[58] *Faragher v. City of Boca Raton*, 118 S.Ct. 2275 (1998); *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257 (1998); *Oncale v. Sundowner Offshore Servs., Inc.*, 114 S.Ct. 3678 (1998).

affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.[59]  When the harassment is committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff need only satisfy the first four elements listed above.[60]

To affect a term, condition, or privilege of employment, the harassing conduct "'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'"[61] The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[62]  If the supervisor's conduct was not severe or pervasive, the employer cannot be held vicariously liable for the supervisor's actions.  If the supervisor's conduct was severe and pervasive, the employer is vicariously liable unless the employer can establish both prongs of the *Ellerth/Faragher* affirmative defense.[63]

The Court must determine whether the alleged facts, viewed in the light most favorable to Plaintiff, constitute severe or pervasive sexual harassment.  Determining whether a hostile work environment exists takes into account the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically

---

[59] *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).

[60] *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354 (5th Cir. 2001).

[61] *Aryain v. Wal-Mart Stores of Tex., LP*, 534 F.3d 473, 479 (5th Cir. 2008)(quoting *Lauderdale v. Tex. Dep't of Crim. Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007)).

[62] *Id.* at 479 (quoting *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275).

[63] *Wyatt v. Hunt Plywood Company, Inc.*, 297 F.3d 405, 409 (5th Cir. 2002).

threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance.[64] Not all harassment will affect the terms, conditions, or privileges of employment. "The mere utterance of an offensive comment or remark which hurts an employee's feelings is not sufficient to affect the conditions of employment."[65] Likewise, "[s]imple teasing, offhand comments, and isolated incidents, unless extremely serious, are not sufficient to affect the terms, conditions or privileges of employment."[66] "While what makes up an actionable claim for a sexually hostile work environment is a fact-sensitive determination, the Supreme Court's decisions strongly suggest that such allegations are not to be exclusively resolved by the jury."[67] Furthermore, courts have set a high standard for what constitutes severe and pervasive harassment for purposes of a hostile work environment claim: "Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace."[68]

The Defendants contend Plaintiff's allegations do not meet the standard of severe or pervasive when viewed subjectively and from the standpoint of Plaintiff's personal relationship with Lawrence. Although Plaintiff claims the harassment was continuous, the ZPD notes that Plaintiff only reported three specific incidents of alleged sexual harassment by Lawrence: (1) the November

---

[64] *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005).

[65] *Alleman v. Louisiana Dept of Economic Development*, 698 F.Supp.2d 644, 658 (M.D. La. 2010).

[66] *Id.*, citing *Lauderdale*, 512 F.3d at 163; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

[67] *Hartfield v. Pizza Inn, Inc.*, No. 02-0097, 2002 WL 31056595, *3 (E.D. La. Sept. 13, 2002)(citing *Indest v. Freeman Decorating Inc.*, 164 F.3d 258, 264 (5th Cir. 1999)).

[68] *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996), *cert. denied*, 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997).

2010 incident where Lawrence allegedly asked Plaintiff to give him "some of that p****"; (2) the March 2011 incident when Lawrence allegedly stated that if Plaintiff and his wife were not good friends, he would "see how good that p**** was"; and (3) the June 2010 incident where Lawrence allegedly asked Plaintiff for "p****" as she was leaving the building.   Plaintiff also identified two other incidents which allegedly occurred at work involving the request by her friend to fix her ticket and being shown pictures of a nude woman on Lawrence's phone.   The Defendants contend these comments constitute "offhand" remarks and must be viewed in light of the past relationship between Plaintiff and Lawrence and the fact that Plaintiff had confided in Lawrence about her marriage and shared intimate details with him.

Defendants also contend Lawrence's alleged conduct does not rise to the level of severe or pervasive based on Plaintiff's own testimony that "He never said anything.  I never said anything. We wasn't close like we used to be, but we kept it on a professional level.  He never said anything about it anymore.  So I just figured it had died out."[69]   When questioned if the harassment by Lawrence had stopped, Plaintiff testified: "It was over."[70]

Plaintiff contends that Lawrence's conduct was both severe and pervasive.  She argues that Lawrence's use of vulgar language in direct sexual propositions was severe and humiliating and that the persistence of his sexual advances was pervasive.  Plaintiff further contends Lawrence's conduct was both subjectively offensive to her and also would be objectively offensive to any reasonable person.  Plaintiff also claims that Lawrence's harassment of her in front of other supervisors is

---

[69] Deposition of Tracy McKneely, pp. 101-102.

[70] *Id.*

additional evidence of the severity of his conduct.  Plaintiff also argues that the record reveals several incidents of harassment beyond the three incidents Defendants addressed.

The Fifth Circuit has declined to recognize conduct equally or perhaps more egregious than that allegedly committed by Lawrence as actionable sexual harassment in prior decisions.[71] Notably, in *Shepherd v. Comptroller of Public Accounts of the State of Texas*, the court affirmed summary judgment in favor of the employer finding that the plaintiff had failed to show the alleged conduct was severe or pervasive as to alter a term, condition, or privilege of employment.[72]  *Shepherd* involved harassment by a male co-worker over a period of two years which consisted of staring, unwelcome touching, and sexually graphic remarks. *Shepherd* involved harassment which included comments by the co-worker such as "your elbows are the same color as your nipples"; "you have big thighs"; and "here's your seat" while patting his lap.[73]

Similarly, the Fifth Circuit also affirmed summary judgment in favor of an employer in *Hockman v. Westward Communications, L.L.C.* where the plaintiff claimed her immediate supervisor commented on her body and behind, commented to the plaintiff about the bodies of other employees, slapped the plaintiff's behind with a newspaper, brushed up against the plaintiff's breasts and behind, attempted to kiss the plaintiff, asked the plaintiff to come in early so they could be alone together, and once stood in the doorway of the ladies' room to watch the plaintiff wash her hands.[74]  Likewise,

---

[71] *Williams v. US Dept of Navy*, 149 F. App'x 264 (5th Cir. 2005); *Hockman, supra.*

[72] 168 F.3d 871 (5th Cir. 1999).

[73] *Id.*

[74] 407 F.3d 317, 321-22 (5th Cir. 2004).

in *Barnett v. The Boeing Company*, the plaintiff complained of sexual harassment by a supervisor who allegedly leered at her, made sexually suggestive comments to plaintiff, and engaged in unwanted touching which occurred from November 2004 through May 2005.[75]  The plaintiff also claimed that this behavior continued even after she had reported the harassment to management[76] and that her supervisor allegedly actively intimidated her after she complained of his actions.[77]  The Fifth Circuit recognized that the record supported the plaintiff's allegations; however, the court affirmed summary judgment in favor of the employer stating: "Looking at the totality of the circumstances, this Court's decisions in *Shepherd* and *Hockman* ... make clear that Barnett failed to demonstrate that her working environment was objectively hostile or abusive within the meaning of Title VII."[78]

Applying the law and jurisprudence to the facts of this case, the Court finds that Plaintiff's allegations, while offensive, are similar to and in some respects less extreme than the conduct set forth in the Fifth Circuit cases discussed above.  Plaintiff's own deposition testimony undermines her arguments that Lawrence's conduct was severe or pervasive.   When testifying about the "cobwebs" comment, Plaintiff stated: "And I did talk with them.  I said that would happen in due time.  And I said not until I'm ready for it.  And, I mean, that wasn't a conversation.  It was just a

---

[75] 306 F. App'x 875, 876, 2009 WL 101932, *1 (5th Cir. Jan. 15, 2009).

[76] *Id.* at 877.

[77] *Id.* at 879.

[78] *Id.*

passing through comment."[79]   When counsel further questioned if Plaintiff was upset by this comment, she responded: "No.  I wasn't upset.  I was just saying I just answered back.  I mean, it would happen in due time."[80]   Plaintiff further testified that she never felt physically threatened or unsafe around Lawrence,[81] and that "He [Lawrence] wasn't the aggressor type..."[82]   Plaintiff admits that she had previously discussed with Lawrence her sexual relationship with her ex-husband.[83] Also, despite Plaintiff's argument that the harassment was ongoing and continuous, her deposition testimony is that "[i]t was three incidents."[84]   Plaintiff also testified:  "So after I told her the three different ordeals that I had with Darryl, that really kind of pushed it over."[85]   Finally, Plaintiff's testimony establishes that the alleged harassment had ceased prior to her filing her formal complaint with Human Resources: "We wasn't close like we used to be, but we kept it on a professional level. He never said anything about it anymore.  So I just figured it had died out."[86]   When further questioned if Plaintiff believed Lawrence had "got the picture that you weren't interested in him,"[87]

---

[79] Deposition of Tracy McKneely, p. 79, lines 19-23.

[80] *Id.* at p. 80, lines 2-4.

[81] *Id.* at p. 93, lines 7-11.

[82] *Id.* at p. 93, line 4.

[83] *Id.* at p. 81.

[84] *Id.* at p. 91, line 13.

[85] *Id.* at p. 85, lines 6-8.

[86] *Id.* at p. 101, lines 22-25.

[87] *Id.* at p. 102, lines 1-2.

she answered: "Right ...It was over."[88]

The Court finds that, while the alleged conduct by Lawrence was inappropriate and understandably offensive to the Plaintiff, the facts of this case and Plaintiff's own testimony support a finding that the alleged conduct does not rise to the level required by the law to be severe or pervasive under the facts of this case.[89]   Accordingly, summary judgment should be granted in favor of the ZPD on this claim and in favor of Lawrence in his individual capacity.

**D.    Title VII Retaliation and Reprisal under La. R.S. 23:967**

Despite Plaintiff's arguments to the contrary, applicable jurisprudence is clear that "the appropriate framework for analyzing a retaliation claim under the Louisiana Whistleblower Statute is the same as that applied in Title VII retaliation cases.[90]   While Plaintiff contends the causation standard is different, *i.e.*, Title VII retaliation requires "but for" causation but Louisiana law requires only a "motivating factor" standard, the Court notes it would reach the same conclusion under either standard of causation.

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by the statute, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action.[91]   If a Plaintiff succeeds in establishing a *prima facie* case, the *McDonnell Douglas* burden shifting

---

[88] *Id.* at p. 102, lines 3,5.

[89] Because the Court finds that Plaintiff has failed to establish a *prima facie* case of hostile work environment, it is unnecessary to address the *Ellerth/Faragher* defense.

[90] *Haire v. Board of Supervisors of LSU*, 719 F.3d 356, 367 (5th Cir. 2013)(citing *Smith v. AT&T Solutions, Inc.*, 90 Fed. Appx. 718, 723 (5th Cir. 2004); *cf. Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002)).

[91] *Id.*, citing *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001).

Doc 178                                    19

framework applies,[92] and the Defendant must articulate a legitimate, non-discriminatory reason for the employment action.[93]  If the employer meets this burden, the burden shifts to the plaintiff to prove the employer's reason is a pretext for the actual retaliatory purpose.[94]  Plaintiff has clearly satisfied the first prong of the test as filing a complaint of sexual harassment is a protected activity under the statute.

The parties dispute whether Plaintiff has established that she suffered an adverse employment action.  In *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court held that, in order to prove an adverse employment action, a plaintiff need not show the employer made an "ultimate employment decision;" rather "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[95]  Although *Burlington Northern* clearly established a less demanding standard for judging whether conduct is actionable as retaliation, the Court noted: "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."[96]  Rather, prohibited employer actions are those "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their

---

[92] *Id.*, citing *Evans*, 246 F.3d at 354.

[93] *Aryain v. Wal-Mart Stores of Tex., L.P.*, 534 F.3d 473, 483 (5th Cir. 2008).

[94] *Id.*

[95] 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)(internal citations and quotations omitted).

[96] *Id.* at 68, 126 S.Ct. 2405.

employers."[97]

Plaintiff contends the following actions constitute adverse employment actions under Title VII: (1) undesirable shift changes, (2) disciplinary action for insubordination, (3) unreasonable sick leave requirements, and (4) being the subject of an internal investigation. The Court will address each of these below.

     1.    <u>Shift Changes</u>

Plaintiff contends her shift had been changed only once prior to her complaint of sexual harassment. She claims that since her complaint, her shift has been changed multiple times to accommodate newer employees in disregard for Plaintiff's seniority.[98] The ZPD contends that all communications officers work twelve hour shifts which run 4:30 to 4:30 or 10:30 to 10:30 and are identified as Shifts A, B, C, and D. The ZPD further contends that Plaintiff works a "split shift," which runs from 10:30 to 10:30 and allows for a communications officer to overlap at the beginning and end of each of the 4:30 shifts. The ZPD claims this shift receives the same eighty-four hours of assigned work per work week and alternates between day and night shifts. The ZPD further argues that there is no substantive difference in the shifts as all shifts receive approximately the same number of day and night shifts and the exact same numbers of hours scheduled and overtime. For these reasons, the ZPD contends shift changes do not constitute an adverse employment action.

In *Lushute v. Louisiana Dept. of Social Services*, the Fifth Circuit held that a change in an employee's work schedule, which was basically a shift change from a four day week to a five day

---

[97] *Id.* (internal quotation marks and citation omitted).

[98] Deposition of Tracy McKneely, pp. 153, 155-57, 227.

week with no change in total hours or compensation, was not an ultimate employment decision under pre-*Burlington Northern* jurisprudence and would not have dissuaded a reasonable worker from making or supporting a charge of discrimination under the *Burlington Northern* standard.[99] Likewise, in *McCoy v. Claiborne Parish Detention Center*, the plaintiff complained that being reassigned to a night shift was discriminatory and retaliatory. The court held that, "[w]ith the change in work hours, [plaintiff] did not suffer any reduction in rank, hours, pay, or benefits. Rather, his new schedule was simply not as desirable as his previous 8:00 a.m. to 4:00 p.m. shift."[100] The Court finds these cases directly on point in the present case. There is no evidence in the record that Plaintiff's shift assignments were unreasonable or unfair, only that the changes were personally undesirable to Plaintiff. The Court finds this is not an employment action so materially adverse that it would have dissuaded a reasonable worker from making a charge of discrimination.

2.   Disciplinary Action for Insubordination/Internal Investigation

Plaintiff claims that, prior to her sexual harassment complaint, she was never written up or investigated for any reason. However, after her complaint, Plaintiff claims she was wrongfully charged with four offenses at once for allegedly raising her voice to Chief McDavid in a meeting. Plaintiff also claims the investigation surrounding her nephew and whether he lived within the school limits was "mishandled" and "false."[101] Although she was ultimately cleared of these charges,

---

[99] 479 F. App'x 553, 2012 WL 1889684, *2 (5th Cir. May 25, 2012)(citing *Hunt v. Rapides Healthcare Sys., L.L.C.*, 277 F.3d 757, 769 (5th Cir.2001)).

[100] No. 07-2147, 2011 WL 1898910, *5 (W.D. La. May 18, 2011)(*See Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999)(stating that a plaintiff's subjective preference is irrelevant under Title VII; the proper standard is an objective one); *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998)("Merely changing [plaintiff's] hours, without more, does not constitute an adverse employment action.")).

[101] Rec. Doc. 26-5, p. 22, citing Deposition of Tracy McKneely, p. 202.

Plaintiff contends she was placed on disciplinary and administrative leave and subjected to an Internal Affairs investigation.  Plaintiff believes Jocelyn Lawrence "likely" made these accusations, as she works at the Plaintiff's nephew's school as a DARE officer and had previously threatened Plaintiff for filing her complaint.[102]  Plaintiff also contends Jocelyn Lawrence is the only ZPD officer with access to her nephew's school records and Plaintiff's personnel file.  Plaintiff also claims she was subjected to an internal affairs investigation based on the incident in which her sister was pulled over.

The ZPD contends Plaintiff was disciplined for insubordination based on her conduct during the meeting with Chief McDavid where the Chief provided Plaintiff with a medical form to be completed by her physician and also notified her of the anonymous complaint concerning her nephew.  When Chief McDavid advised Plaintiff that an investigation was being initiated, the ZPD contends Plaintiff became angry and raised her voice at the Chief.  The ZPD acknowledges that Plaintiff was cleared of all charges concerning her nephew, but maintains that the notices of discipline Plaintiff received were proper based on her conduct and pursuant to the civil service system.  While the ZPD does not agree that this disciplinary action or investigation constitutes an adverse employment action, the ZPD also contends there is no causal connection between these actions and Plaintiff's complaint.  The ZPD contends Plaintiff cannot establish that the thirty-day discipline she received would not have occurred "but for" her sexual harassment complaint.  The ZPD notes that Plaintiff admitted that she raised her voice at Chief McDavid in the meeting and that Plaintiff could have appealed this discipline through the Zachary Civil Service system yet she chose

---

[102] *Id.*

not to do so.[103]

Under Fifth Circuit precedent, initiating an investigation is not an adverse employment action.[104]  In *Tate v. Louisiana Dept. of Transportation & Development,* the district court held that "'[f]alse accusations, criticism, and investigations are not adverse employment actions.'"[105] In *Tate*, the plaintiff alleged that she was humiliated by the investigation and recommended disciplinary action to which she was subjected.  The court noted: "The Fifth Circuit has made clear, however, that '[e]ven the capacity of an action to stigmatize an employee is inadequate to make it an adverse employment action.'"[106] The *Tate* court ultimately found that "[w]ithout some deprivation an investigation, accusation, or criticism, even if false, is not sufficient to qualify it as an adverse employment action."[107]  More specifically, the court held as follows:

> Plaintiff makes numerous conclusory allegations, none of which involve her suffering harm other than those ordinary tribulations of the workplace.  Courts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable because these are not actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.[108]  The Court finds that these are just the type of allegations that Plaintiff

---

[103] Deposition of Tracy McKneely, pp. 137-38.

[104] *Marceaux v. Lafayette City-Parish Consol. Government*, 921 F.Supp.2d 605, 639 (W.D. La. 2013)(citing *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998).

[105] No. 11-1212, 2013 Wl 796015, at *12 (E.D. La. Mar. 4, 2013), quoting *Ellis v. Crawford*, No. Civ.A 3:03 CV 2416D, 2005 WL 525406, at *8 (N.D. Tex. Mar. 3, 2005)(citing *Breaux v. City of Garland*, 205 F.3d 150, 157-58, n. 14 (5th Cir. 2000)).

[106] *Id.*, quoting *Ellis*, 2005 WL 525406, at *8 (citing *Breaux*, 205 F.3d at 157-58, n. 14)("Stigma, by itself, without an impact on one's employment, does not constitute an adverse employment action").

[107] *Id.*  The Court notes that this analysis also applies to Plaintiff's claims that Chief McDavid allegedly told a new hire that "nobody wants to work with Ms. McKneely."  Rec. Doc. 26-5, p. 21.

[108] *Id.* at *14, citing *Burlington Northern*, 548 U.S. at 68.

Doc 178                                                24

makes here.[109]

The reasoning and holding in *Tate* are directly applicable to the present Plaintiff's complaints regarding her disciplinary notices and investigations.  Even if the disciplinary thirty day suspension constitutes an adverse employment action, the Court finds Plaintiff has failed to show that her sexual harassment complaint, rather than her conduct in the meeting with her superior, was the "but for" cause for the disciplinary action.  Plaintiff's own testimony confirms that she was insubordinate to her superior: "he started talking loud and so I got loud, also."[110]  Plaintiff testified that, when the Chief threatened to fire her if she went back to the news media, she responded, "you may get your chance."[111]  Clearly, the ZPD has shown a legitimate, non-discriminatory reason for Plaintiff's discipline for which Plaintiff has failed to show evidence of pretext.

### 3.    Sick Leave Requirements

Plaintiff also claims that her doctor's excuses have been disregarded and questioned and that she must go to a doctor chosen by ZPD or be fired.  The ZPD contends that as Plaintiff's employer, it is entitled to receive updates on her condition from her physician under the Family and Medical Leave Act. The ZPD further contends it is in no way unusual or harassing for an employer to verify the reasons for an employee's leave, particularly when they are receiving full compensation during said leave.  Because Plaintiff's position required her to qualify her weapon and carry a firearm, and her medical condition prevented her from re-qualifying her weapon, the ZPD contends it had a right

---

[109] *Id.*

[110] Deposition of Tracy McKneely, p. 130, lines 20-21; p. 132, lines 1-3.

[111] *Id.* at p. 131, lines 23-24.

to request medical information relating to Plaintiff's condition to justify her leave with pay and evaluate when she could return to work. In fact, the ZPD contends that, because Plaintiff never lost any compensation while on medical leave, her claims that the ZPD sought information from her physicians cannot rise to the level of an adverse employment action. Furthermore, despite Plaintiff's attempt to blame Lawrence's presence at the range, there is no dispute that Plaintiff's wrist/arm pain is the reason that she could not re-qualify her weapon. Plaintiff's own doctor's note indicated she could not shoot for at least six months, which belies any argument that somehow Lawrence's presence at the range kept Plaintiff from re-qualifying her weapon.[112]

In *Lopez v. Henderson*, the Fifth Circuit affirmed summary judgment on a plaintiff's claim that her employers called her doctor in retaliation for her filing discrimination complaints.[113] Although this was a pre-*Burlington Northern* case, the court held that "the placement of telephone calls to her doctor do not, in any event, satisfy the *Ellerth* definition of a tangible employment action."[114] In *Wells v. Gates*, applying the *Burlington Northern* standard, the Fourth Circuit held that an employer requesting further medical documentation beyond what was provided did not constitute a materially adverse employment action.[115]

The Court finds Plaintiff's claims in this regard to be similar to the complaints in the cases discussed above. The Court also finds that the medical requests made by the ZPD did not constitute

---

[112] Deposition of Tracy McKneely, p. 149, 146.

[113] 190 F.3d 538 (5th Cir. 1999).

[114] *Id.* at *4, n. 17 (citing *Watts v. Kroger Co.*, 170 F.3d 505, 512, n.5 (5th Cir. 1999)).

[115] No. 08-1358, 336 F. App'x 378, 383, 2009 WL 1991212 (4th Cir. July 10, 2009).

a materially adverse employment action such that a reasonable employee would be dissuaded from making a complaint of discrimination. Plaintiff's medical leave was never denied, and she never suffered any decrease in compensation while on medical leave. Alternatively, if the medical requests by the ZPD did constitute an adverse employment action, the Court finds that, considering Plaintiff's hand/wrist condition in relation to her job requirement to qualify her weapon, the ZPD has presented a legitimate, non-discriminatory reason for this action for which Plaintiff has failed to show pretext.

The Court further notes that, under La. R.S. 23:967, the plaintiff must prove an actual violation of state law, not just a good faith belief that a law was broken.[116] "Other than this difference, the standards governing claims under the Whistleblower statute and Title VII retaliation claims are materially indistinguishable."[117] In further support of granting summary judgment on Plaintiff's Reprisal claim under Louisiana law, the Court agrees with the analysis and holding in *Dane v. Board of Supervisors of LSU*, where the plaintiff also claimed a violation of La. R.S. 23:967.[118] The plaintiff in *Dane* argued that the scope of the state reprisal law was broader in scope than retaliation under Title VII. The court rejected plaintiff's arguments and held:

> Plaintiff's arguments are unpersuasive. The case law requires that a plaintiff prove he disclosed, threatened to disclose, or opposed workplace conduct that was an actual violation of state law. It is not sufficient that the employee reasonably believes there is a violation of law. The statute requires an employee to prove an actual violation of state law in order to prevail. Although the plaintiff presented evidence showing

---

[116] *Sprull v. City of Baton Rouge*, No. 09-689, 2012 WL 2426793, * 2 (M.D. La. June 26, 2012)(citing *Corley v. Louisiana ex rel. Div. of Admin. Office of Risk Mgmt.*, 816 F.Supp.2d 297, 313-14 (M.D. La. 2011); *Scott v. Turner Indus. Group, LLC*, No. 09-872, 2011 WL 5023840 (M.D. La. Oct. 19, 2011)).

[117] *Id.*, citing *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 805 (5th Cir. 2007); *Scott*, 2011 WL 5023840.

[118] No. 07-138, 2010 WL 3717242 (M.D. La. 2010).

that he opposed sexual harassment in the workplace, he did not attempt to prove that LSU violated state law by subjecting him to a hostile environment because of his sex. Nor is the plaintiff arguing or attempting to prove the alleged fraud he reported, or that the sexual harassment of others he complained about, actually constituted a violation of state law.

Because proof that a workplace/employment act or practice is an actual violation of state law is an element of the plaintiff's claim under LSA–R.S. 23:967, the plaintiff cannot defeat summary judgment merely by asserting that he has identified what he believed to be unlawful practices and was subject to reprisal for disclosing or opposing them. Plaintiff's failure to come forward with any evidence on this essential element requires summary judgment and dismissal of his claim under LSA–R.S. 23:967 against LSU.[119]

The Court agrees with and adopts the reasoning set forth in *Dane* as further support to grant summary judgment in favor of the Defendants on Plaintiff's state law reprisal claim.

### E.    First Amendment Free Speech Retaliation

Plaintiff contends she has a claim under the First Amendment via 42 U.S.C. § 1983 based on Chief McDavid's alleged threat following her initial complaint to the news media: "If you go back to the news media, I'm going to fire you."[120]  To prevail on a Section 1983 First Amendment retaliation claim, a public employee must establish the following: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse action.[121]  The Fifth Circuit has held that whether "the speech at issue is on a matter of public concern is a question of law that must be

---

[119] *Id.* at *9 (internal footnotes omitted).

[120] Deposition of Tracy McKneely, p. 131.

[121] *Modica v. Taylor,* 465 F.3d 174, 179–80 (5th Cir.2006).

determined by the court."[122]

The Fifth Circuit has held that public employees "do not surrender all their free speech rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern."[123]  As such, a public employee's "speech is protected by the First Amendment when the interests of the worker as a citizen commenting upon matters of public concern outweigh the interests of the state as an employer, in promoting the efficiency of the services it performs through its employees."[124]  However, the Fifth Circuit has explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[125]

The Court finds that Plaintiff has failed to demonstrate the first element of her First Amendment claim since she has not suffered an adverse employment action.  In this context, "[a]dverse employment actions are 'discharges, demotions, refusals to hire, refusals to promote, and reprimands.'"[126]  Moreover, the Fifth Circuit "has pointedly 'declined to expand the list of actionable actions,' noting that 'some things are not actionable even though they have the effect of chilling the

---

[122] *Id.* quoting *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005).

[123] *Charles v. Grief*, 522 F.3d 508, 512 (5th Cir.2008).

[124] *Id.*

[125] *Charles*, 522 F.3d at 512.

[126] *Kincheloe v. Caudle*, 2009 WL 3381047, at* 16 (W.D. Tex. Oct. 16, 2009)(quoting *Breaux v. City of Garland*, 205 F.2d 150, 157 (5th Cir.), *cert. denied*, 531 U.S. 816, 121 S.Ct. 52, 148 L.Ed.2d 21 (2000)).

exercise of free speech.'"[127] "Among the type[s] of actions held by the Fifth Circuit *not* to be adverse employment actions are mere accusations or criticism (even oral threats or abusive remarks), investigations, psychological testing, false accusations, and polygraph examinations that do not have adverse results for the plaintiff."[128] For example, in *Kincheloe v. Caudle*, the plaintiff argued that his free speech rights were infringed upon by his employer because, among other things, "the Police Chief and Mayor have both pushed for Mr. Pogue's resignation in retaliation."[129] Relying on Fifth Circuit precedent, the district court held that "[v]erbal threats of termination and criticism have been held not to rise to the level of an adverse employment action."[130]

The Court notes that Plaintiff was not subjected to an adverse employment action for previously going to the media with her sexual harassment complaints. The record reflects that her reprimand and disciplinary actions were taken because of her conduct and insubordination during the meeting with Chief McDavid. Although Chief McDavid's comments in response Plaintiff speaking to the media may have had the effect of chilling her free speech rights, it does not inherently make such comments actionable under clearly established law. Therefore, because Plaintiff has not set forth sufficient evidence to show the existence of the first element of the

---

[127] *Id.*, quoting *Breaux*, 205 F.3d at 157.

[128] *Id.*, citing *Breaux*, 205 F.3d at 157-58.

[129] *Id.*

[130] *Id.*, citing *Breaux*, 205 F.3d at 159-60; *Chandler v. La Quinta Inns, Inc.*, 2008 WL 280880 at *3 (5th Cir. Feb. 1, 2008)(threat of termination did not amount to constructive discharge or adverse action). *See also Hernandez v. Johnson*, 514 F. App'x 492, 499, 2013 WL 657697 (5th Cir. Feb. 22, 2013)(holding that a phone call threatening that plaintiff could be fired was not a materially adverse employment action); *Roberts v. Unitrin Specialty Lines Ins. Co.*, 405 F. App'x 874, 2010 WL 5186773, at *5 (5th Cir. Dec. 21, 2010)(holding that supervisor's threats to fire employee without merit was nothing more than simple teasing, offhand comments, and isolated incidents).

analysis, the Court finds that summary judgment is proper in favor of the ZPD on the First Amendment retaliation claim.

## III.    CONCLUSION

For the reasons set forth above, the *Motions for Summary Judgment* filed by Defendant Darryl Lawrence[131] and Defendant Zachary Police Department[132] are granted.  Plaintiff's claims shall be dismissed with prejudice.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

BATON ROUGE, Louisiana, this 28 day of August, 2013.

**SHELLY D. DICK, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[131] Rec. Doc. No. 17.

[132] Rec. Doc. No. 18.